UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 18-657 |
| v. | OPINION |
| FRANCIS RAIA. |  |

**WILLIAM J. MARTINI, U.S.D.J.**

Defendant Francis Raia ("Defendant") was convicted of knowingly and intentionally conspiring to commit an offense against the United States using the mail, contrary to 18 U.S.C. § 1952(a)(3) (Travel Act) and in violation of 18 U.S.C. § 371 (Conspiracy Against the United States). Indictment ¶ 1, ECF No. 1. Now before the Court is Defendant's motion for a new trial. ECF Nos. 54, 57 ("Motion"). Oral argument was held on October 21, 2019. For the reasons set forth below, the motion is **DENIED**.

I. BACKGROUND

Defendant's brief fairly represents the facts of this case and each parties' position.

In 2013, Mr. Raia ran for Hoboken city council along with a slate of other candidates. In addition, Mr. Raia supported a ballot referendum that would allow certain landlords to reset the base rents on certain vacant rent-controlled units to the market rate. As part of the campaign, Mr. Raia employed a get out the vote strategy that focused voters in the Hoboken Housing Authority [("HHA")], by soliciting their vote by mail vote. [Raia argued] the campaign sought to enlist many of these same individuals to work on Election Day by publicizing the campaign, wearing t-shirts, and handing out campaign literature. These individuals would be paid $50 for their work.

The Government's case against Mr. Raia accused that he enlisted confidants to approach voters in [HHA] Housing, and ordered that those confidants offer voters $50 in exchange for the voter casting a mail in ballot for the candidates and questions Mr. Raia supported. The Government also alleged that in connection with this plan, Mr. Raia demanded that he be permitted to inspect the completed ballots before they were submitted to the Board of Elections, Mr. Raia engaged a middleman to process checks to these voters in order to conceal the payments, and had other individuals complete mandatory New Jersey Election Law Enforcement Commission ("ELEC") reports.

Mot. at 2. On June 25, 2019, a jury convicted Defendant of being part of a conspiracy to commit an offense against the United States, namely, by violating the Travel Act.

1

## II.  DISCUSSION

Defendant posits two reasons he must be granted a new trial: (1) because the verdict was against the weight of the evidence and (2) because the prosecution mischaracterized the evidence, creating a substantial possibility that the verdict was tainted.

### A.  Weight of the Evidence

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33(a) ("Rule 33"). The Third Circuit has described the rules governing a Rule 33 "weight of the evidence" motion as follows:

> A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted. Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.

*United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (cleaned up). "Motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." *Id.*

Here, Defendant argues for a new trial because "[t]he Government relied heavily on Calicchio, Holmes, and Frazier to make this case to the jury, but their testimony was too unreliable to form the basis of any case." Mot. at 6. That is not sufficient. First, Calicchio, Holmes, and Frazier's testimony was not so patently unreliable that the Court must throw it out and overturn the jury's determination. Second, the Court is not convinced "that there is a serious danger that a miscarriage of justice has occurred." *Brennan*, 326 F.3d at 189.

#### 1.  *Reliability of Witnesses*

Most of Defendant's arguments amount to challenges to Calicchio, Holmes, and Frazier's credibility and motives. *See* Mot. at 7-13. But as the Third Circuit has noted, when the jury is made aware of witnesses' motivations, potential biases, or inconsistencies, it is "the jury's responsibility to decide whether or not to believe [the witnesses'] testimony." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014). Here, the jury was repeatedly made aware of the motivations, potential biases, or inconsistent statements Defendant cites in support of his motion.

##### a.  Matthew Calicchio

As to Calicchio, Defendant argues his testimony cannot be credited because:

1. Calicchio did not mention Mr. Raia in grand jury testimony until he was offered a plea deal;
2. Calicchio testified that he brought unsealed ballots to Frazier and watched Frazier alter them, but Fraizer never testified as such;
3. Calicchio testified inconsistently with respect to Holmes's involvement;
4. Despite Calicchio's statement that he delivered checks to Ryan Yacco, Yacco stated he was "fairly certain" that he picked the checks up directly;

2

5. Calicchio stated that he taped Mr. Raia, even though the Government admitted that it never happened; and
6. Calicchio's confirmed he was untruthful in other areas of life, including by failing to file tax returns or report income and using an employer's credit card for personal expenses.

None of these are sufficient to overturn the jury's determination. The jury was made aware Calicchio's plea agreement, Tr. at 33:25-34:19, and a witness recounting more evidence after striking a deal is entirely typical. In any event, the jury was also informed of the inconsistent testimony. Tr. at 99:16-102:3. The fact that Frazier did not corroborate Calicchio's account does not mandate a retrial either. Given the crime charged, the Government had to prove Raia instructed others to pay for votes, not that any individual tampered with a ballot. Further, minor inconsistencies regarding immaterial details of the scheme, Calicchio's incorrect statement that he taped Raia, and the unrelated, dishonest conduct do not require a retrial. The jury heard Calicchio's testimony—including the impeaching material—and was fully capable of assessing its credibility. Tr. 113:1-10 (statement by Government that "we do not believe there are any recordings of Mr. Raia"); 114:10-115:13 (cross examination regarding failure to pay taxes and other dishonest acts); *see also United States v. Friedland*, 660 F.2d 919, 931 (3d Cir. 1981) ("We cannot say that it was an abuse of discretion to defer to the jury in this case, in which ample evidence on the issue of [the witness's] credibility was placed before the jury.")

### b. Michael Holmes

As to Holmes, Defendant complains his testimony:

1. Was produced pursuant to a non-prosecution agreement;
2. Supports Defendant's innocence, in that Holmes testified that he saw workers on election day, told voters they were required to work, and provided voters with campaign paraphernalia to use while working;
3. Was inconsistent, in that Holmes testified both that he paid individuals for their votes and that he told them they had to work on election day; and
4. Contradicts Calicchio's testimony regarding changing votes.

Once again, these are insufficient reasons to overturn the jury's determination. Non-prosecution agreements are entirely routine. On cross examination, Holmes did agree that he "told the voters who said, 'Do I have to work?' they must work in order to get paid," but he also firmly represented, multiple times, that he told voters that "if they worked, they would get paid, and if they didn't work, they would get paid." Tr. at 412:6-413:16. The jury heard the somewhat contradictory statements and other impeachment material, and chose who and what to believe. They also heard the testimony Defendant argues supports his defense, and still chose to convict. The Court agrees with their determination that the evidence Defendant cites did not significantly undermine the Government's case. Therefore, none of the issues Defendant points to in Holmes's testimony justifies a new trial. *See Salahuddin*, 765 F.3d at 346 (stating that "it was the jury's responsibility to decide" whether to believe testimony when presented with impeaching material).

### c. Freddie Frazier

Similar to the other witnesses, Defendant complains Frazier's testimony:

3

1. Was inconsistent with statements Frazier made to the Government and grand jury, which were exculpatory of Mr. Raia;
2. Was produced as a result of a non-prosecution agreement; and
3. Supports Defendant's innocence, in that he testified voters were told they had to work to get paid and were given campaign paraphernalia to distribute.

The jury was made aware of the prior inconsistent statements and the non-prosecution agreement. Tr. at 537:2-12; 548:2-554:18; 556:14-22. Therefore, that impeaching material is not sufficient to overturn their determination. *See Salahuddin*, 765 F.3d at 346. Further, Frazier testified that the "work requirement" was "a cover story" and that the Defendant instructed others to bring ballots back to the club *unsealed* to be checked. Tr. at 535:18-19, 538:7-13. Like for Calicchio and Holmes (and viewing them in combination), the issues raised by Defendant are insufficient to require a new trial. *Brennan*, 326 F.3d at 189 (stating motions for a new trial should only be granted in "exceptional cases").

### 2. *Danger of a Miscarriage of Justice*

As noted above, "weight of the evidence" Rule 33 motions should only be granted if the Court believes "that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted." *Brennan*, 326 F.3d at 189. Here, despite minor inconsistencies between witness testimony, the Government sufficiently proved the crime alleged. There is no "serious danger that a miscarriage of justice has occurred." *Id.*

### B. <u>Mischaracterization of Evidence</u>

Defendant also argues for a new trial based on the Government's alleged mischaracterization of evidence during summations. "Improper statements made during summation may warrant a new trial when such statements cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014). Prosecutors' comments "are improper if the statements mischaracterize certain evidence or are based upon evidence not in the record." *United States v. Onque*, 169 F. Supp. 3d 555, 571 (D.N.J. 2015), *aff'd*, 665 F. App'x 189 (3d Cir. 2016). On the other hand, "[p]rosecutors are entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence. The appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate the defendant's due process rights." *United States v. Stiso*, 708 F. App'x 749, 756 (3d Cir. 2017) (cleaned up) (quoting *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991)).

Here, Defendant argues two categories of Government statements in summation were improper: (1) that the Defendant paid hundreds of voters to cast mail-in-ballots in his favor and (2) that unsealed ballots were reviewed by the campaign prior to submission. Defendant's complaints about the latter statements are easily dealt with. He argues that because "[h]ow ballots were handled, and whether or not there were unsealed ballots received[,] is not an element of the charged offenses, reference to it only serves to make the actual alleged criminal conduct appear more egregious and inflame the passions of the jury." Mot. at 16. But Defendant does not cite any authority for the proposition that the Government may only discuss the formal elements of an offense in summation. Here, witnesses testified that as part of the overall scheme,

4

the Defendant instructed his co-conspirators to bring unsealed ballots back to his social club. Tr. at 52:13-53:4, 68:25; Tr. 68:21-69:7, 380:10-16. Thus, the Government did not make an improper statement in summarizing the plot to the jury. *See Onque*, 169 F. Supp. 3d at 571 (defining improper statements as those mischaracterizing evidence). Further, the statement certainly did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Brown*, 765 F.3d at 296.

With respect to the former statement, Defendant argues "[t]here is simply no evidence in the record that supports" the claim that "between October and November of 2013, the [D]efendant . . . voted hundreds of times for himself and for a referendum that he supported." Mot. at 15 (quoting Tr. at 761:3-5). But the Government *did* introduce evidence that 378 out of the 395 people who received $50 checks also voted by mail. Tr. at 482:3-483:13. In summation, the Government asked the jury to consider that figure in connection with the evidence that the Defendant's co-conspirators (including Calicchio, Holmes, and Frazier) "carried out his order to offer low-income voters $50 in exchange for their votes. To check the ballots, to make sure that those voters voted the right way. To make sure that that $50 paid off." Tr. at 761:22-762:4. Thus, the Government asked the jury to infer that the Defendant paid hundreds of individuals $50 for their votes (i.e., voted hundreds of times) given (1) the overlap of individuals who voted by mail and received $50 checks; (2) the witnesses' testimony that the reason they paid voters $50 was for them to vote for the Defendant by mail; and (3) evidence that the Defendant wanted to check the ballots to ensure votes were cast according to his preferences. Accordingly, the inference that Defendant paid for hundreds of votes was supported by record evidence and permissibly sought. *See Werme*, 939 F.2d at 117 (providing considerable latitude to prosecutors to argue the evidence and any reasonable inference that can be drawn therefrom). In any event, seeking such an inference did not "infect[] the trial with unfairness [or] make the resulting conviction a denial of due process." *Brown*, 765 F.3d at 296.

## III. CONCLUSION

For the reasons set forth above, Defendant Francis Raia's motion for a new trial, ECF No. 54, is **DENIED**. An appropriate order follows.

Date: October __, 2019

WILLIAM J. MARTINI, U.S.D.J.

5